## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA

| | | |
|---|---|---|
| AIR EVAC EMS, INC., d/b/a Air Evac Lifeteam and AirMedCare Network, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | Civil Action No. __2:21-cv-00105__ |
| JAMES A. DODRILL, in his official capacity as West Virginia Insurance Commissioner, | ) | |
| | ) | |
| Defendant. | ) | |

## COMPLAINT FOR DECLARATORY, INJUNCTIVE, AND EMERGENCY RELIEF

Plaintiff Air Evac EMS, Inc. ("Air Evac"), by and through its attorneys, alleges as follows:

### INTRODUCTION

1.      Air Evac is an emergency air-ambulance provider that offers life-saving emergency transportation and in-flight care to critically ill and injured patients throughout the country, including in West Virginia. Air Evac is also a federally-regulated air carrier for purposes of the express-preemption provision of the Airline Deregulation Act of 1978 (ADA). Accordingly, States "may not enact or enforce a law, regulation, or other provision having the force and effect of law related to" Air Evac's "price[s], route[s], or service[s]." 49 U.S.C. § 41713(b)(1); *Air Evac EMS, Inc. v. Cheatham*, 910 F.3d 751, 766–69 (4th Cir. 2018).

2.      Air Evac provides a vital service in rural West Virginia, particularly in light of the COVID-19 epidemic that is currently raging in this state, by ensuring that critically-ill and injured patients are transported rapidly to an appropriate treatment facility in time to save their lives. As the Fourth Circuit put it, "particularly in rural areas, air ambulances can play a vital and life-saving role in responding to medical emergencies." *Cheatham*, 910 F.3d at 757.

1

3.     To make its life-saving care affordable for all rural West Virginians, Air Evac offers a prepaid, discounted Membership Program to both individual West Virginia residents and to West Virginia businesses and municipalities (which can purchase a membership on behalf of their employees or citizens). In exchange for a small, prepaid membership fee (less than $100 per year for an individual member and their household), Air Evac considers any charges for the member's emergency transport—beyond any amount paid by the member's insurer or other third parties—to be paid in full. The Program is essentially a debt-cancellation agreement: in exchange for the prepaid membership fee, if a member is transported by Air Evac (or an Air Evac sister company), then Air Evac (or the Air Evac sister company that is the transporting provider) will cancel the portion of the bill that would otherwise be the patient's out-of-pocket responsibility, including any co-pay, deductible, or balance that is not covered by the patient's insurance. The Membership Program is the largest of its kind in the nation, and many West Virginia municipalities have purchased these memberships to ensure that their residents have affordable access to life-saving emergency air ambulance services.

4.     As the Fourth Circuit held in *Air Evac EMS, Inc. v. Cheatham*—affirming an injunction entered by this Court—state efforts to regulate the Membership Program are subject to ADA preemption. 910 F.3d at 767 (ADA preempts law capping reimbursement for certain air ambulance transports at the amount of a patient's annual membership fee); *Air Evac EMS, Inc. v. Cheatham*, 2017 WL 4765966, at *10 (S.D. W. Va. Oct. 20, 2017), *aff'd*, 910 F.3d 751 (4th Cir. 2018) (holding that ADA preempts "[W. Va. Code] §5-16-8a(b)'s regulation of Air Evac's subscription agreements" and enjoining state defendants from enforcing it).

5.     Notwithstanding the holding of *Cheatham*, Defendant James A. Dodrill, West Virginia's Insurance Commissioner ("Defendant"/"Commissioner"), has set out to regulate the Membership Program once again. The Offices of the Insurance Commissioner ("OIC") has filed an administrative complaint against Air Evac seeking penalties and a cease-and-desist order for Air Evac's

alleged transaction of "insurance" without a license. Ex. A (Notice of Hearing); Ex. B (Administrative Complaint). Due to Defendant's interpretation and proposed enforcement of these "Licensing Laws," federally-regulated air carriers must now cease offering prepaid, discounted services to their members, unless they obtain OIC's approval to operate as insurers and submit to various onerous and costly regulatory requirements. The purpose of this strategy—which was developed with the advance knowledge of Air Evac's main competitor in West Virginia—is to regulate Air Evac's popular Membership Program out of existence.

6.      The Commissioner was well aware of the conflict between this enforcement action and federal law from the start. In an email to executives of the rival air-ambulance provider, Defendant revealed that he was exploring how to "shut down the subscription plans" by regulating them as insurance. Ex. C ( 7/19/19 email). He confirmed: "We know this will draw litigation." *Id.*

7.      As such, the instant enforcement action is just another stage in a years-long' legal and regulatory attack waged against Air Evac by West Virginia state officials. In the 2018 *Cheatham* decision, the Fourth Circuit unanimously ruled that the ADA preempted state laws and fee schedules enforced by OIC and the Public Employees Insurance Agency (PEIA), that capped what Air Evac is paid for transporting injured workers and public employees. *See* 910 F.3d at 767 ("The regulatory scheme only exists because West Virginia was attempting to lower payments for air ambulance services."). Air Evac has repeatedly advised OIC that under the ADA, it lacks jurisdiction to enforce the Licensing Laws against Air Evac. But despite the federal injunction issued in *Cheatham*, and despite the federal courts' clear holding that the ADA preempts state regulation of Air Evac's Membership Program, the Commissioner has decided to proceed with this ill-advised enforcement action. It is also ill-timed, coming as it does during a global pandemic when West Virginians need affordable access to emergency air ambulance transportation more than ever before.

8.      Air Evac therefore files this suit for declaratory and injunctive relief on the ground

that the Licensing Laws are preempted by the ADA as applied to Air Evac and cannot be enforced against it. Moreover, and as explained more fully in the accompanying Application for Emergency Relief, Air Evac also seeks a temporary restraining order and preliminary injunction forbidding Defendant from enforcing the Licensing Laws against Air Evac in the interim.

9.    Absent such relief, on March 2, Air Evac will be forced to participate in a state administrative hearing that Defendant lacks the authority to conduct under federal law, the outcome of which is obviously foreordained: Air Evac will be forced to cease operating its Membership Program in the State, and will be exposed to potential civil penalties, as a result of state laws that Defendant lacks authority to enforce.

## JURISDICTION AND VENUE

10.    This Court has subject matter jurisdiction over this action for declaratory and injunctive relief under 28 U.S.C. § 1331. This case raises important federal questions including whether the ADA, 49 U.S.C. § 41713(b)(1), preempts the Licensing Laws because they are "related to" the prices and services of federally-registered air carriers. When a plaintiff seeks a declaratory judgment that state laws or regulations are contrary to federal law, and also an injunction prohibiting a state official from applying or enforcing those laws and regulations, there is "no doubt that federal courts have jurisdiction under § 1331 to entertain [the] suit." *Verizon Md., Inc. v. Pub. Serv. Comm'n of Md.*, 535 U.S. 635, 642 (2002) (citing *Shaw v. Delta Air Lines Inc.*, 463 U.S. 85, 96 n.14 (1983)); *see, e.g., Air Evac EMS, Inc. v. Cheatham*, 260 F. Supp. 3d 628, 638–42 (S.D. W. Va. 2017) (entertaining ADA preemption suit seeking declaratory and injunctive relief against West Virginia officials).

11.    Pursuant to its equitable powers, this Court may grant injunctive relief against state officers who are violating, or planning to violate, federal law. *See Verizon Md., Inc.*, 535 U.S. at 645 (courts may grant such relief, under *Ex parte Young*, 209 U.S. 123 (1908), so long as the plaintiff has alleged a "violation of federal law and seeks relief properly characterized as prospective"); *Armstrong*

*v. Exceptional Child Ctr., Inc.*, 575 U.S. 320, 327 (2015) ("The ability to sue to enjoin unconstitutional actions by state and federal officers is the creation of courts of equity, and reflects a long history of judicial review of illegal executive action"); *Cheatham*, 260 F. Supp. 3d at 638–42. Under 28 U.S.C. Section 2201, this Court may also grant appropriate declaratory relief under these circumstances. *Verizon Md.*, 535 U.S. at 645–46; *Cheatham*, 260 F. Supp. 3d at 641–42.

12.     Venue is proper under 28 U.S.C. § 1391(b) because the Southern District of West Virginia is where Defendant performs his official duties and a substantial part of the events giving rise to the claim occurred.

## PARTIES

13.     Plaintiff Air Evac EMS, Inc. d/b/a Air Evac Lifeteam, is a Missouri corporation with its principal place of business in O'Fallon, Missouri. Air Evac provides air ambulance services in states around the country, including West Virginia.

14.     Defendant James A. Dodrill is the West Virginia Insurance Commissioner and head of the Offices of the Insurance Commissioner. He is empowered to enforce the West Virginia Insurance Code and investigate violations thereof. W. Va. Code §§ 33-2-3, 33-2-11, 33-2-3a. Defendant Dodrill enforces the Licensing Laws challenged here, and may pursue a cease-and-desist order; injunctive relief; civil penalties; and criminal penalties against a party that transacts insurance without a license. W. Va. Code §§ 33-2-11; 33-3-1; 33-44-6, 33-44-7, 33-44-9; 33-11-7.

## STATEMENT OF FACTS

**I.     Air Evac, a Federally Regulated Air Carrier, Offers Life-Saving Air Ambulance Services in West Virginia and Around the Country**

15.     Air Evac provides air ambulance services around the country, including in West Virginia. Air Evac operates pursuant to an air carrier operating certificate issued by the Federal Aviation Administration ("FAA") under 14 C.F.R. Part 119. Also known as a "Part 135" certificate, this authorizes on-demand service in accordance with the FAA's rules in Part 135. Ex. D (Air Evac

Part 135 Certificate). Under the related FAA Operations Specifications, each Provider is authorized to provide on-demand air ambulance services in the 48 contiguous United States and the District of Columbia. Ex. E (FAA Operating Specifications). Air Evac also has an economic authorization from the federal Department of Transportation ("DOT") to operate as an "air taxi" under 14 C.F.R. Part 298, meaning it is authorized to transport persons or property and does not engage in regular round-trip flights. Ex. F (Part 298 Certificate).

16.    Under the ADA, the federal DOT possesses economic regulatory authority over air carriers. *See* 49 U.S.C. § 40101(a). The Secretary of Transportation is empowered by statute to ensure that air carriers—including, specifically, "air ambulance operators"—do not engage in any unfair or deceptive practice or utilize unfair methods of competition or harm consumers. *See* 49 U.S.C. § 41712(a).

17.    Air Evac conducts some transports across state lines, including from the site of an emergency in one state to a medical facility in another state. Other flights occur within a particular state. But Air Evac operates all of its flights under the authority of the FAA and DOT.

18.    Courts have unanimously found that air ambulance providers—including Air Evac—are "air carriers" for purposes of ADA preemption. *See, e.g., Cheatham*, 910 F.3d at 764 ("On this question, the plain text of the law, the overall structure of the federal aviation laws, and the subsequent acts of Congress all point in the same direction: air ambulances are within the scope of the ADA.").

19.    Air Evac maintains a fleet of air ambulances ready to respond at a moment's notice to medical emergencies, often in rural or remote locations that lack appropriately-advanced medical services (*e.g.*, trauma hospitals and burn centers). Air Evac's air ambulances quickly transport patients—regardless of their ability to pay—facing serious or life-threatening emergencies, while providing medical care during the flight.

20.    Air Evac provides transports in medically necessary, emergency cases where a higher

level of care is needed and ground transportation would be too slow and risk imperiling the life of the patient. As such, the services Air Evac supplies radically improve patient outcomes and reduce the overall cost of care. In short, Air Evac's air ambulances save lives.

21.    As an emergent care provider, Air Evac may be dispatched by first responders, the emergency department of a hospital, or by an attending physician. Air Evac does not self-dispatch.

22.    Where a covered hospital or attending physician orders a transport, the regulations and procedures set out by the Emergency Medical Treatment and Labor Act ("EMTALA"), 42 U.S.C. § 1395dd, generally apply. Moreover, under state law, air ambulance providers are generally required to transport patients regardless of their insurance status or ability to pay. *See*, *e.g.*, W. Va. Admin. Code § 64-48-7.2.9 (emergency medical services personnel may be disciplined for refusing to "render emergency medical care because of a patient's . . . . financial inability to pay"). In keeping with federal and state law, Air Evac transports patients regardless of their insurance status or ability to pay.

23.    Providing this life-saving care is expensive. For each air ambulance, Air Evac must acquire and customize a commercial aircraft so that patients may be transported and receive medical care in route. Each aircraft must also be constantly maintained and fueled so that it is ready to respond to emergencies at any time, day or night.

24.    Maintaining this state of readiness also requires that Air Evac staff each base with two pilots per day, each performing 12 hour shifts, to maintain 24-hour coverage. To account for pilot time off, multiple pilots must be employed full-time at each base. And to provide the medical services necessary to treat patients at the scene of medical emergencies and during the flights, each aircraft must be staffed with highly trained paramedics and nurses. As with the pilots, multiple teams of medical personnel must be employed for each base.

25.    Air Evac is often underpaid for the services it provides to uninsured and underinsured patients. These underpayments contribute to the rising cost of air ambulance services because—for

Air Evac to stay in business—the cost of undercompensated care must be shifted to other payors such as commercial insurers.

## II.    Air Evac Offers a Membership Program to Make Sure Its Life-Saving Service is Affordable for All West Virginia Residents

### A.    Background and History of the Membership Program

26.    Air Evac has several sister air ambulance companies, including Guardian Flight LLC; Med-Trans Corporation; and REACH Air Medical Services LLC. Throughout this Complaint, Air Evac and its sister air ambulance companies are referred to collectively as "the Providers."

27.    The Providers are all federally-registered air carriers; each maintains a Part 135 air carrier operating certificate with the FAA, as well as a Part 298 economic authorization with the DOT. The Providers each offer transportation in largely different geographic regions in 38 States across the country. Air Evac is the only one of the Providers that has air ambulance bases with aircraft based in the State of West Virginia. Air Evac's four West Virginia bases are located in New Martinsville, Summersville, Beckley, and Logan.

28.    The Providers are commonly owned by their parent, Air Medical Group Holdings LLC. Global Medical Response, Inc. ("GMR"), is the parent company of AMGH LLC ("AMGH") and—through it—of each of the Providers.

29.    In most states in which they operate, Air Evac and the other Providers offer a subscription membership program ("Membership Program"). The Membership Program can be traced back to the founding of Air Evac. In 1985, three private citizens in West Plains, Missouri founded a helicopter air ambulance service, Air Evac, "to give rural people in this south-central Missouri area better access to emergency care." McCarty, *When Seconds Count*, Rural Missouri, https://tinyurl.com/y44pa8vv. To make this service financially viable, Air Evac's founders decided to sell prepaid memberships. *Id.* They borrowed this idea from the REGA Foundation in Switzerland. Vernon, *Air Evac Lifeteam Strives to Save Lives by Saving the Precious "Golden Hour,"* Clay County Times-

Democrat (Aug. 18, 2004), https://tinyurl.com/1ghn31az; *see Air Evac LifeTeams Reaches the 1 Million Mark in Memberships*, Air Evac Lifeteam (Dec. 22, 2011), https://tinyurl.com/y3u8yxhm. Like REGA members, Air Evac's members paid a small annual fee; if a member was later transported, "the service [was] free" (beyond anything paid by insurance). McCarty, *supra.*

30.    Today, the Membership Program continues to operate largely as it did in the early days of Air Evac. The Providers offer the Membership Program as part of an alliance of affiliated air ambulance providers called AirMedCare Network, which includes Air Evac, Guardian Flight, Med-Trans Corporation, and REACH Air Medical Services. Ex. G (Membership Application).

31.    AirMedCare Network has approximately 3 million members nationwide, and the Membership Program is the largest program of its kind in the country.

32.    AirMedCare Network is not a separate legal entity (*e.g.*, a limited liability company or a corporation). Rather, it is a business unit housed within the Air Evac EMS, Inc. legal entity. AirMedCare Network marketing and sales staff are generally employed by the legal entity Air Evac EMS, Inc. at its West Plains, Missouri office and across the country; and Air Evac EMS, Inc. has registered as doing business as "AirMedCare Network" in the State of Missouri. The trade name "AirMedCare Network"—which is registered with the U.S. Patent and Trademark Office and owned by GMR—is also used by the Providers to describe the alliance of the participating Providers to market AirMedCare Network subscriptions.

### B.    The Membership Program in West Virginia

33.    Air Evac has been selling memberships in the State of West Virginia since 2008. Generally speaking, Air Evac has sold and marketed two general types of membership agreements in West Virginia:  individual memberships ("business-to-consumer") and memberships for businesses, cites, and municipalities ("business-to-business"). Air Evac and the other Providers offer these same general types of memberships in other states around the country. To sell memberships in West

Virginia, Air Evac employs two full-time Membership Sales Managers who are located in West Virginia. Air Evac also engages the services of 31 Independent Representatives not employed by Air Evac who sell membership agreements in West Virginia and are located there as well.

34.    Individual memberships generally work as follows: In exchange for a small fixed membership fee, amounting to less than $100 in a given year, the relevant Provider considers any emergency air ambulance charges in excess of the amount paid by a member's contractual insurance or by other third-parties to be prepaid by the member. When an individual purchases a membership, it covers all persons in that individual's household as well.

35.    Individuals who purchase a membership from one company in the AirMedCare Network are automatically enrolled in the membership for each of the AirMedCare Network companies. Stated another way, an AirMedCare Network membership gives members reciprocal membership in each participating company's membership program. For example, in 2020, a West Virginia member whose home-state provider is Air Evac was transported by REACH while in Nevada. In such cases, REACH will categorize the flight as a member transport and cancel any out-of-pocket obligation the member would otherwise owe after insurance and other responsible third parties have paid. An AirMedCare Network membership thus "travels" with the member.

36.    In West Virginia, Air Evac also sells memberships to businesses or to municipalities or counties. Businesses may either pay for their employees' memberships in a lump sum or have them paid for through payroll deductions of enrolled employees. Nearly fifty West Virginia businesses, government entities, or associations make AirMedCare Network memberships available to their employees. This includes a city; three county boards of education; a deputy sheriff's association; two hospitals; and around fifteen fire departments.

37.    West Virginia counties and municipal entities may also purchase memberships on behalf of their residents ("Municipal Site Plan"). For a small annual fee based on the county or city's

population, the Providers consider all air ambulance charges that would otherwise be the patient's out-of-pocket responsibility to be prepaid—so long as the pickup location occurs within the designated geographic limits specified in the particular municipal membership agreement. Residents covered by a Municipal Site Plan may also upgrade their membership agreement to include air ambulance transportation pickups from all areas served by Air Evac or any of the other Providers. Three West Virginia counties—Logan County, Wetzel County, and Tyler County—have purchased Municipal Site Plans. As a result, in 2020 every resident in each of these counties was covered by a membership purchased on their behalf by the county in which they reside.

38.     Wetzel County renewed its Municipal Site Plan for another year on February 4, 2021. Logan County's county-wide membership plan expires on March 16, 2021. The renewal process for this plan has been initiated, and Air Evac expects it to be renewed. Logan County's Municipal Site Plan was Air Evac's single largest source of membership-related revenue in West Virginia in 2020.

39.     Some 68,608 people in West Virginia are covered by the Membership Program.

40.     In 2020, Air Evac (or, in a few cases,  the other Providers) performed 152 transports for West Virginia members. On those flights, the transporting Providers cancelled a total of approximately $624,713 that the members would otherwise have had to pay out-of-pocket for the flights. That translates to an average of approximately $4,109 in debt written off per West Virginia member transport in 2020.

41.     In 2020, Air Evac earned approximately $784,865 in membership-related revenue from the sale of new memberships or the renewal of existing memberships in the State of West Virginia.[1]

---

[1] Because of the Medicare rule against routine waivers of co-pays and deductibles, the aggregate membership fee collected by Air Evac each year for Medicare beneficiaries (or for all members) must be reasonably expected to be greater than the aggregate amount of charges written off for all Medicare beneficiary member (or all member) transports. *See* 68 Fed. Reg. 14245, 14253 (Mar. 24, 2003).

**C.      The Membership Program Is a Prepaid Service, or Debt Cancellation, Agreement.**

42.      The Membership Program allows patients to partially prepay for a service provided by the air ambulance provider. In essence, the membership program is a debt-cancellation agreement. Again, in exchange for the membership fee, if a member is transported by one of the Providers, whatever portion of that member-patient's debt remains after other third parties (such as insurers) have made their required payments will be cancelled by that Provider.

43.      The Membership Program is not an insurance policy. Specifically, the Terms and Conditions of Membership provide, "Membership is not an insurance policy and cannot be considered as a secondary insurance coverage or a supplement to any insurance coverage." Ex. G.

44.      Third-party transports are not covered. An AirMedCare Network membership applies only to member transports conducted by an air ambulance company in the AirMedCare Network, which must be a wholly-owned subsidiary of AMGH.

45.      There is no guarantee of service. Members cannot contact Air Evac or any other AirMedCare Network Provider directly for transport when services are needed. When a third-party medical professional or first responder requests a Provider's service, the Provider does not know if the patient to be transported is a member. After the transport is complete, the Provider seeks payment. If the patient is a member, however, the portion of payment that would otherwise be the patient's out-of-pocket responsibility is cancelled—*i.e.*, considered prepaid—by the membership fee. Ex. G.

46.      Neither AirMedCare Network (which is not a legal entity) nor any of the Providers is required to indemnify or pay a specified amount to their members or to third-party air-ambulance companies under any circumstances.

47.      The Providers offer memberships to all consumers, and do not employ actuarial or underwriting criteria—such as age, health status, geographical location, or available insurance coverage—to screen potential members or adjust the price of the membership. (However, the

Providers do offer a discounted membership price for individuals over the age of 60, and the Providers cannot offer the membership to current Medicaid recipients.) Membership cost is determined solely by the value of the membership or—in the case of municipal memberships—by population. In states where the Membership Program is offered, a prospective member generally need only have a U.S. address, and not be a current Medicaid recipient, in order to purchase a membership agreement.

48.    When a customer purchases or renews an AirMedCare Network membership, the membership fee for each new member or renewal is initially collected by the legal entity Air Evac EMS, Inc., but is then swept into a "concentration" account maintained by the Providers' parent company (GMR). This account contains revenue from multiple sources, and the money it contains is used to fund the ongoing operations (payroll, aircraft fuel, etc.) of AMGH subsidiaries, including the Providers. On a monthly basis, membership fees are credited to the ledger account of the Provider that operates in the geographic region where a given membership was purchased. Membership fees are not pooled or placed in a reserve fund (in the manner of an insurance company) because, under the Membership Program, the Providers do not promise to pay money to members or any third-parties.

49.    None of the Providers makes any cash payment to any other Provider when a member is transported; the AirMedCare Network (which is not a legal entity) does not make cash payments to any of the Providers when a member is transported; and neither Air Evac nor the AirMedCare Network reimburses or otherwise pays any Provider for transporting a member.[2]

---

[2] For internal purposes only, GMR tracks the performance of AirMedCare Network as a business unit, as well as tracking the performance of the different Providers. As part of this performance assessment, when a Provider transports a member, the Provider is assigned a $500 "credit" on its performance books, with a corresponding $500 "expense" to the performance books of AirMedCare Network. But this performance evaluation device does not represent an actual bank transfer or cash payment of any kind.

### III.    Under the Airline Deregulation Act, States Cannot Regulate Air Evac's "Prices, Routes, or Services"

50.    Before 1978, the economic aspects of air transportation were regulated by the Civil Aeronautics Board ("CAB"), which "set[] strict rates for interstate passenger air travel." *Cheatham*, 910 F.3d at 755. In 1978, however, Congress determined that a market-based approach would best serve the industry and its customers. *Id.* at 756.

51.    Accordingly, Congress passed the ADA to "largely deregulate[] domestic air transport." *Am. Airlines, Inc. v. Wolens*, 513 U.S. 219, 222 (1995). Congress phased out the CAB and, in its place, gave the federal DOT economic oversight authority over the industry, *Cheatham*, 910 F.3d at 756—with an explicit mandate to "promote maximum reliance on competitive market forces," 49 U.S.C. § 40101(a)(6), (a)(12).

52.    As part of this deregulatory effort, Congress included a broad, express preemption provision in the ADA. 49 U.S.C. § 41713(b)(1). Under it, States "may not enact or enforce a law, regulation, or other provision having the force and effect of law related to a price, route or service of an air carrier that may provide air transportation under this subpart." *Id.*

53.    The ADA's preemption provision reflects Congress's "broad preemptive purpose," *Morales v. Trans World Airlines, Inc.*, 504 U.S. 374, 383–84 (1992), to "stop[] States from imposing their own substantive standards with respect to rates, routes, or services" of air carriers, *Wolens*, 513 U.S. at 232.

54.    By virtue of this express preemption provision, the ADA "displaces all state laws that fall within its sphere, even including state laws that are consistent" with the ADA, *Morales*, 504 U.S. at 387 (cleaned up), so long as they have "the force and effect of law" and are "related to a price, route, or service" of an "air carrier," 49 U.S.C. § 41713(b)(1).  The ADA thus "confers on private entities (*i.e.*, covered carriers) a federal right to engage in certain conduct subject only to certain (federal) constraints." *Murphy v. NCAA*, 138 S. Ct. 1461, 1480 (2018).

55.    The first requirement for ADA preemption is that the regulated entity be an "air carrier" for purposes of the ADA. *See* 49 U.S.C. § 41713(b)(1). As already stated, the Fourth Circuit has held that Air Evac is an "air carrier." *Cheatham*, 910 F.3d at 764 ("On this question, the plain text of the law, the overall structure of the federal aviation laws, and the subsequent acts of Congress all point in the same direction: air ambulances are within the scope of the ADA."). This holding is consistent with other courts around the country. *See, e.g.*, *Scarlett v. Air Methods Corp.*, 922 F.3d 1053, 1059–61 (10th Cir. 2019); *Ferrell v. Air Evac EMS, Inc.*, 900 F.3d 602, 606–07 (8th Cir. 2018); *Bailey v. Rocky Mountain Holdings, LLC*, 889 F.3d 1259, 1272 (11th Cir. 2018).

56.    The second requirement for ADA preemption is that the challenged state law provision have the "force and effect of law." 49 U.S.C. § 41713(b)(1). A state law has this effect if it "imposes a "binding standard of conduct that operate[s] irrespective of any private agreement." *Northwest, Inc. v. Ginsberg*, 572 U.S. 273, 282 (2014) (citing *Wolens*, 513 U.S. at 229 n.5).

57.    The third requirement for ADA preemption is that the challenged state law provision "relate[] to" an air carrier's prices or services. 49 U.S.C. § 41713(b)(1). As the Supreme Court has held, a state-law rule "relates to" an air carrier's prices or services if it expressly references them or if it has a significant economic effect on them. *Morales*, 504 U.S. at 388. And a law can "relate" to an air carrier's rates or services within the meaning of the ADA "even if the law is not specifically designed to affect [them], or the effect is only indirect." *Id.* at 386 (citation omitted).

58.    The ADA thus forbids states from capping, reducing, or regulating an air carrier's prices for its services. *See, e.g.*, *Cheatham*, 910 F.3d at 766–70; *Cox*, 868 F.3d at 902, 907; *EagleMed*, 227 F. Supp. 3d at 1275-81.

59.    In addition to preempting direct state regulation of prices, the ADA preempts state regulation of membership programs such as frequent flyer programs, through which members obtain access to advantageous fares or other privileges. *See Ginsberg*, 572 U.S. at 284 (claims involving frequent

flyer programs "relate[d] to" the airline's rates because the program awarded "mileage credits" that "either eliminated or reduced" the cost of a ticket); *Wolens*, 513 U.S. at 226 (same); *Godfread*, 359 F. Supp. 3d at 756 (North Dakota law banning air ambulance membership agreements "relates to air ambulance rates and services as it prohibits subscription agreements which directly impacts charges for air ambulance services"); *Cheatham*, 910 F.3d at 767–68 (ADA preempts law requiring air ambulance providers to accept membership fees as "total reimbursement for state employees"); *Concovich v. Air Evac EMS, Inc.*, 2016 WL 843276, at *2 (S.D. Ill. 2016) (ADA preempts a state-law claim that "concerns the elimination of . . . a membership that reduces part of a rate" for air ambulance services); Letter from D.J. Gribbin, Gen. Counsel, DOT, to Hon. Greg Abbott, Tex. Attorney Gen., at 9–12 (Nov. 3, 2008) ("Gribbin DOT Letter"), https://tinyurl.com/ycpx3zn6 (opining that ADA preempted Texas regulations of air ambulance membership programs).

60.     The ADA likewise preempts state laws that impose onerous economic regulatory requirements on air carriers that dictate the terms under which air carriers may offer and sell their services to potential customers, or impose onerous economic regulatory requirements on air carriers as a condition of entering a given market or offering their services to the public. *See Morales*, 504 U.S. at 378, 387–91 (ADA preempts state enforcement of standards governing the content and form of airline advertising); *Valley Med Flight, Inc. v. Dwelle*, 171 F. Supp. 3d 930, 940–42 (D.N.D. 2016) (ADA preempts state law requiring air ambulance providers to have in-network agreements with the state's largest insurer in order to be placed on a primary call list); *Med-Trans Corp. v. Benton*, 581 F. Supp. 2d 721, 727, 733–37 (E.D.N.C. 2008) (ADA preempts state law requiring air ambulance provider to obtain a "certificate of need" from state regulators in order to operate in North Carolina); *Hiawatha Aviation of Rochester, Inc. v. Minnesota Dep't of Health*, 389 N.W.2d 507, 508–09 (Haw. 1986) (ADA preempts state law requiring federally-regulated air ambulance provider to obtain a state license before operating in the state); Gribbin DOT Letter at 9–12 (opining that ADA preempts various Texas law

requirements regulations of air ambulance subscription programs that served as "prohibited barrier[s] to market entry").

61.     In West Virginia, specifically, federal courts—including this one—have held that the ADA preempts state laws and regulatory requirements that relate to air ambulance rates, including those that regulate air-ambulance memberships. *Cheatham*, 910 F.3d at 766–70; *Cheatham*, 2017 WL 4765966, at *10; *see also Chanze v. Air Evac EMS, Inc.*, 2018 WL 5723947 (N.D. W.Va. Nov. 1, 2018) (ADA preempts class plaintiff's claims challenging the reasonableness of air ambulance rates).

### IV.     West Virginia's Insurance Licensing Laws

62.     Like most States, West Virginia requires all those who engage in activities qualifying as "insurance" to obtain a state license. The provisions of West Virginia law that Defendant Dodrill seeks to apply to Air Evac's Membership Program are referred to collectively as the "Licensing Laws."

63.     The Licensing Laws consist of two sets of provisions that—when combined—place any entity deemed to be an insurer under the continuing regulatory control of OIC. *First*, the Insurance Code defines "insurance" as "a contract whereby one undertakes to indemnify another or to pay a specified amount upon determinable contingencies."  W. Va. Code § 33-1-1; W. Va. Code § 33-44-3(f); *see also* W. Va. Code §§ 33-1-10(b), 33-1-16, and 33-1-17 (defining "accident and sickness insurance," "insurance policy," and "premium"). *Second*, the Insurance Code requires anyone who transacts insurance in West Virginia (with certain exceptions) to be licensed by the Commissioner and submit to the dictates of the Insurance Code and the Commissioner's regulations. W. Va. Code § 33-3-1(a); § 33-44-1 *et seq*.

64.     Combined, these Licensing Laws are the hook that then requires entities deemed to be insurers to satisfy a series of requirements for obtaining a license from OIC and Defendant Dodrill. To obtain a license, an out-of-State applicant like Air Evac must potentially satisfy the following requirements, among others:  (a) "Be an incorporated stock insurer, or an incorporated mutual insurer

or a reciprocal insurer," W. Va. Code § 33-3-2(a); (b) Maintain minimum capital requirements of $1,000,000 and another $1,000,000 of "additional surplus funds," W. Va. Code § 33-3-5b(a)-(b); (c) Be authorized to transact insurance in the State of the out-of-state applicant's domicile, W. Va. Code §§ 33-3-2(c), 33-3-4(e); (d) Submit copies of the applicant's charter, bylaws, and annual financial statement (among other things) to the Commissioner, W. Va. Code § 33-3-4; (e) Pay mandatory licensing and filing fees, W. Va. Code § 33-3-13(a); and (f) "Satisf[y]" the Commissioner that the applicant is in compliance with all relevant state laws, "and that such insurer is solvent and will transact insurance in a legal, proper and just manner," W. Va. Code § 33-3-7(a).

65.    Combined, the Licensing Laws are also the hook that require licensed insurers to submit to the applicable requirements of the West Virginia Insurance Code on an ongoing basis, as well as be subjected to OIC's ongoing oversight authority. *See, e.g.*, W. Va. Code § 33-3-8. To remain in good status with OIC and renew their status as insurers each year, licensees must potentially fulfill the following requirements, among others: (a) file annual statements with the Commissioner disclosing their "financial condition, transactions and affairs," W. Va. Code § 33-4-14; (b) annually file "a financial statement made under oath of its president or secretary and on a form prescribed" by OIC, W. Va. Code § 33-3-14(a); (c) self-report its gross amount of premiums and pay premium taxes imposed by the State, W. Va. Code §§ 33-3-14(a), 33-3-14a; (d) submit annual audited financial reports to the Commissioner, W. Va. Code § 33-3-1 *et seq.*; (e) conform its insurance policies to include the standard policy language and other requirements dictated by the Code, W. Va. Code §§ 33-6-1 *et seq.*; and (f) submit to OIC's regulatory authority over insurance rates, W. Va. Code §§ 33-16b-1 *et seq.*; 33-20-1 *et seq.*

66.    The Licensing Laws are backed by Defendant's coercive power. Anyone who transacts insurance in West Virginia without a license faces civil penalties, criminal penalties, a cease-and-desist order, and injunctive relief—all of which the State is authorized to seek. W. Va. Code §§ 33-11-7 (cease

and desist order); 33-44-6 (injunctive relief); 33-44-7(a) (civil penalties of up to $20,000 for each unauthorized insurance transaction); 33-44-9 (criminal fines, 1-5 years' imprisonment, or both). Anyone who violates any other provision of the West Virginia Insurance Code is subject to a fine of up to $1,000, jail time, or both. W. Va. Code § 33-4-8.

67.    Subscription programs, like the one Air Evac offers in West Virginia as well as other States, are common to the air ambulance industry. As discussed *supra* ¶¶ 26–49, Air Evac's program provides that a member pays a small fixed membership fee and, in exchange, upon the provision of transportation services, Air Evac and its sister Providers consider all air ambulance charges not paid by a member's contractual insurance or responsible third party to be prepaid by the member. Ex. G. The membership program offered by Air Evac and the other Providers is not insurance. Its Terms and Conditions explicitly state as much.

68.    Before the instant enforcement action, neither Defendant nor any other West Virginia legal authority of which Air Evac is aware treated prepaid debt cancellation agreements directly between ambulance providers and their members as "insurance" under West Virginia law. Until now, neither Defendant nor any other West Virginia legal authority has suggested that Air Evac—an air-ambulance provider—must register as an "insurer" under West Virginia law. Indeed, as late as July 2019, OIC described air ambulance membership programs in a consumer's guide brochure as "a limited discount program," not as "insurance." Ex. H (7-17-2019 email). This brochure also directed consumers to file any complaints with the *federal* Department of Transportation.

69.    Numerous ground ambulances in West Virginia operate under a membership-based model similar to Air Evac's. For example, the Wetzel County Emergency Ambulance Authority offers a membership program that has terms and conditions similar to Air Evac's Membership Program— including cancelling any out-of-pocket obligation that would otherwise be owed by the patient. *See* Ex. I (Wetzel County Application); *see also Subscription*, White Sulphur Springs Emergency Medical Services,

Inc., https://tinyurl.com/1b7mlt11 (last visited Feb. 8, 2021); *WVFD EMS Subscriptions*, Wilderness

Volunteer Fire Department, https://tinyurl.com/11hl1c97 (last visited Feb. 8, 2021).

70.    On information and belief, OIC and Defendant Dodrill have not undertaken any

enforcement actions against these ground ambulance providers for engaging in the unauthorized sale

of insurance under West Virginia law.

### V.    Despite the ADA and the *Cheatham* Decision, Defendant Dodrill Enforces the Licensing Laws to Regulate Air Evac's Prices and Services

#### A.    The Federal Courts Thwart West Virginia's First Attempt to Regulate Air Evac's Prices and Services, Including its Membership Program

71.    The *Cheatham* litigation arose when West Virginia officials—including OIC—

embarked on a "regulatory scheme" intended to reduce air-ambulance reimbursements for transports

provided to injured workers and to the State's own employees. *See Cheatham*, 910 F.3d at 767, 758. The

Insurance Commissioner, and the Director of the Public Employees Insurance Agency (PEIA), used

their statutory power to set fee schedules to set the reimbursement rate for air ambulance providers

at a steeply-discounted rate. *Id.* at 758, 767–68. In combination with bans on billing patients for the

balance, the OIC and PEIA effectively capped air ambulance reimbursement at an amount far below

Air Evac's billed charges. *See id.*

72.    Separately, PEIA orchestrated the enactment of a new law in 2016 that specifically

targeted the Membership Program. That law, HB 4315, further capped what Air Evac could receive

for transporting PEIA insureds at one of two amounts:  the federal Medicare rate or the annual cost

of Air Evac's membership program (which is generally less than $100, *supra* ¶ 34). HB 4315, Acts

2016, c. 130, *codified at* W. Va. Code § 5-16-8a (eff. June 10, 2016 through June 3, 2019).

73.    In successfully urging the West Virginia Legislature to pass the 2016 law targeting Air

Evac's membership program, state officials worked in "close" connection with executives from

HealthNet, a not-for-profit air ambulance provider in West Virginia and Air Evac's competitor. Ex. J

(9/12/19 email) ("One thing that I didn't mention was SB 4315 from 2016. We worked close with Ted [Cheatham] (PEIA) and Governor Tomblin to support this bill. It ultimately passed"). Owned by a consortium of West Virginia medical centers, HealthNet operates air ambulances from ten bases, nine of which are in-state. *See* https://tinyurl.com/4pquj7h9.

74.     In 2016, Air Evac filed suit in the U.S. District Court for the Southern District of West Virginia, challenging this rate-capping scheme as preempted by the ADA. On October 20, 2017, the District Court held that "the ADA preempts" each of the State's rate-capping devices, including the newly-enacted membership law. *Cheatham*, 2017 WL 4765966, at *10. The District Court also enjoined the enforcement of the preempted laws and rules against air ambulance providers. *Id.*

75.     In 2018, the Fourth Circuit unanimously affirmed that the ADA preempted the State's efforts to regulate Air Evac's prices for its services, including the statutory provision targeting Air Evac's membership program. *Cheatham*, 910 F.3d at 767–70. "There was nothing subtle or indirect about this approach," Judge Wilkinson wrote for the panel; "it was directly targeted at payments for air ambulance services. *Id.* at 767. "If such actions involving an air carrier are not 'related to price,' it is unclear what meaning the phrase would have left." *Id.* at 767–68.

76.     As a result of Cheatham, Defendant Dodrill is currently subject to a binding federal injunction forbidding him from applying workers'-compensation laws or fee schedules to regulate Air Evac's prices for its services. *See Cheatham*, 2017 WL 4765966, at *10.

## B.     The Commissioner Targets Air Evac's Membership Program—In Apparent Consultation With Air Evac's Competitor

77.     Not to be deterred, OIC responded to *Cheatham* with a new regulatory assault on Air Evac's Membership Program. As Air Evac has learned (primarily through state FOIA requests), State officials once again apparently did so in collaboration with Air Evac's competitor, HealthNet.[3]

---

[3] Further demonstrating West Virginia's recalcitrance: even after *Cheatham*, PEIA refuses to pay the balance of Air Evac's outstanding transport charges. That refusal—based in part on the assertion of

78.    In May 2019, HealthNet executive Brian Doughty—at the request of an OIC employee—sent OIC copies of two of Air Evac's municipal membership contracts with Logan County, West Virginia, and Wetzel County, West Virginia. Ex. K (5-28-2019 email).

79.    In early June 2019, OIC's Director of Health Policy, Ellen J. Potter, sent Doughty an advance copy of a brochure OIC had developed containing information about air ambulance membership programs. Ex. L (6-10-2019 email). Potter thanked Doughty for his "input on the brochure," which she said was "being printed." *Id.* Doughty replied to ask "how this will be distributed," then invited Potter "and [Potter's] team" to visit HealthNet's training center so that HealthNet could "share with you and your team our next steps as it relates to memberships." *Id.*

80.    On June 21, 2019, Defendant Dodrill emailed Doughty and Clinton Burley (another HealthNet executive) a message titled, "Air Ambulance Subscription Agreements." Ex. C . Defendant Dodrill said, "I wanted to let you know that I am considering whether to take action which could include issuance of a cease and desist order finding that the agreements already issued in WV are unapproved insurance products sold by unlicensed insurers/agents." *Id.* At that time, Air Evac had not been notified of any potential OIC proceeding.

81.    In mid-July 2019, OIC released the brochure on air-ambulance membership programs that it had drafted with the editing assistance of HealthNet, Air Evac's competitor. Ex. H. The brochure essentially consisted of a series of warnings about the perceived limitations of air-ambulance membership programs. *Id.* Notably, the brochure did not describe air-ambulance membership programs as insurance under West Virginia law. *See id.*; *see supra* ¶ 68. It also targeted only air-ambulance memberships, not any of the similar ground ambulance memberships that exist in the state. *See supra* ¶ 69.

---

sovereign immunity—is the subject of a separate state court proceeding. *Air Evac v. West Va. Public Employees Ins. Bd., et al.*, Civil Action No.: 19-AA-169 (Cir. Ct. Kanawha Cty. 2020).

82.    Also in July 2019, Doughty responded to inform Defendant Dodrill that HealthNet had an upcoming meeting with Senator Manchin, Senator Capito, and Congresswoman Miller to discuss air ambulance issues in West Virginia. Ex. C. Doughty asked if there were "any updates on the membership discussions we've had" which he would be "happy to share" with the legislators. *Id.*

83.    In response, Defendant told Doughty and Burley, "I wish I could join you in D.C. to discuss this important issue with our delegation." *Id.* (7/19/19 email) He then told them that "I currently have my legal team looking into a two-pronged approach. First, I want to determine whether, under my existing statutory authority, I can take action now to shut down the subscription plans on the basis that they are unlicensed insurance products sold by unlicensed insurance producers. We know this will draw litigation." *Id.* He also explained that "I am working with the [National Association of Insurance Commissioners] on model legislation that we might be able to introduce in the upcoming legislative session," although "this prong does not look promising from a timing standpoint." *Id.* Defendant ended by extending "best wishes for a successful round of meetings next week." *Id.*

84.    On September 10, 2019, Doughty and Joshua Gillespie of HealthNet met with the Roane County Chamber of Commerce and delivered a presentation discussing "countywide membership contract[s]" as well as HealthNet's own "options available to the public." Ex. J. Doughty also apparently informed members of the Roane County Chamber of Commerce about "the WV Insurance Commissioners [sic] involvement with the Air Evac membership product"—information that Air Evac itself was unaware of and was not yet known to the public. *Id.*

85.    On September 17, 2019—just a week after Doughty's presentation—OIC served Air Evac with a discovery subpoena and a notice of investigative hearing regarding the Membership Program's status under the West Virginia insurance laws. Ex. M (First Notice of hearing/Discovery Request).

86.    In response to OIC's discovery requests, Air Evac provided OIC with the information

requested, but "object[ed] to this Administrative Proceeding in its entirety because [the ADA] precludes the application of state insurance laws . . . to Air Evac's membership program."

87.    On February 6, 2020, an investigative hearing was held at which OIC officials deposed two Air Evac employees regarding the operations of the Membership Program. At this hearing, Air Evac's counsel again objected that "this entire proceeding is preempted" under the ADA. Air Evac's counsel also objected that certain documents, including ones Air Evac obtained through a FOIA request before the hearing, show "in no uncertain terms that . . . this investigation . . . has been orchestrated in no small part with one of our private commercial competitors in the State of West Virginia; a fact that undoubtedly casts a shadow on this entire proceeding and warrants our objection on the record." The OIC hearing examiner allowed the depositions to go forward.

88.    After the February 6 hearing, OIC served Air Evac with a second set of discovery requests. Air Evac complied with OIC's request while again objecting that the ADA deprived the Commissioner of any authority over the Membership Program.

### C.    The Commissioner Initiates An Enforcement Action Against Air Evac

89.    On December 29, 2020, the Commissioner initiated an administrative enforcement action against Air Evac. According to the attached Administrative Complaint, OIC's Legal Division has concluded that through the Membership Program, Air Evac has engaged in the unauthorized transaction of insurance in West Virginia. Ex. B. The Complaint seeks a cease and desist order requiring Air Evac to cease selling or offering the Membership Program in West Virginia, as well as a fine of up to $20,000 for each alleged violation of the Licensing Laws. Ex. B. OIC later informed Air Evac that Defendant Dodrill himself would preside over the hearing and rule over the matter himself (as opposed to a hearing examiner).

90.    Under the Licensing Laws as construed by the Commissioner, Air Evac and its Membership Program are subject to the licensing and regulatory regime described above. *Supra* ¶¶ 62–

66. Specifically, Air Evac is restricted—on pain of penalties enforced by Defendant Dodrill—from offering or selling memberships for prepaid, discounted air ambulance services to West Virginia residents unless it obtains an insurance license and maintains regulatory approval from the Commissioner.

91.    The Licensing Laws bar Air Evac from charging prepaid, discounted prices for their services unless Air Evac satisfies costly and onerous regulatory pre-conditions for entering the market. The Licensing Laws regulate the manner and terms under which Air Evac may offer and sell its transportation services to the public, and effectively bar Air Evac from an entire way of structuring and collecting payment for its services as an air carrier. Not complying with the Licensing Laws would subject Air Evac to (among other things) fines and criminal penalties.

92.    Air Evac is a provider of air medical transportation, not an insurance company. Air Evac is not structured to operate as an insurance company or to comply with the various regulatory requirements that West Virginia law requires insurers to satisfy in order to obtain and maintain an insurance license. Complying with the Licensing Laws would be costly, time-consuming, and require significant restructuring of Air Evac's basic operations. If the Licensing Laws apply to Air Evac, Air Evac would be compelled to cease offering memberships in West Virginia—as Air Evac and the other Providers have been forced to do in other states under these circumstances.

         **D.    The Licensing Laws, as Applied to Air Evac, are Preempted by the ADA.**

93.    The Licensing Laws have the force and effect of law, directly relate to Air Evac's prices and services, and are preempted by 49 U.S.C. § 41713(b)(1). *See Wolens*, 513 U.S. at 226 (state-law provision affecting frequent-flyer membership program is preempted under the ADA); *Cheatham*, 910 F.3d at 767–68 (state law relating to air ambulance membership program is preempted under the ADA); *supra* ¶¶ 50–61.

94.    OIC has stated its view that the Licensing Laws may be saved from ADA preemption

by the McCarran-Ferguson Act, 15 U.S.C. § 1012(b) ("MFA"). That statute provides that "No Act of Congress shall be construed to invalidate, impair, or supersede any law enacted by any State for the purpose of regulating the business of insurance, or which imposes a fee or tax upon such business, unless such Act specifically relates to the business of insurance." It thus establishes a narrow exception to federal preemption for state laws regulating the "business of insurance." The meaning of the "business of insurance" is a question of federal—not state—law. *See, e.g.*, *Blackfeet Nat. Bank v. Nelson*, 171 F.3d 1237, 1245 (11th Cir. 1999) ("The meaning of 'insurance' in the context of McCarran-Ferguson is a federal question").

95.    The MFA does not save the Licensing Laws from ADA preemption. The MFA has been displaced by the ADA, which expressly clarifies that all State laws directed at an air carrier's prices or services—whether insurance-related or not—are preempted, "[e]xcept as provided in" the ADA itself. 49 U.S.C. § 41713(b)(1); *see Bailey v. Rocky Mountain Holdings, LLC*, 136 F. Supp. 3d 1376, 1381–82 (S.D. Fla. 2015), *aff'd*, 889 F.3d 1259 (11th Cir. 2018).

96.    In addition, prepaid medical services plans and debt-cancellation agreements, such as the Membership Program, do not quality as the "business of insurance" within the meaning of the MFA, because they involve no promise to indemnify subscribers and therefore implicate none of the concerns that motivated the Congress that enacted the MFA, including guaranteeing that insurers remain solvent to pay out claims. *See Group Life & Health Ins. Co. v. Royal Drug. Co.*, 440 U.S. 205, 225–30 (1979); *Anglin v. Blue Shield of Va.*, 693 F.2d 315, 317–18 (4th Cir. 1982); *First Nat'l Bank of E. Ark. v. Taylor*, 907 F.2d 775, 779–80 (8th Cir. 1990); *FTC v. IAB Marketing Assocs., LP*, 746 F.3d 1228 (11th Cir. 2014).

### E.    The Commissioner Refuses to Stay the Hearing Pending This Suit, Requiring Air Evac to Seek Emergency Relief from this Court

97.    A hearing on the administrative complaint is currently scheduled for  March 2, 2021. On February 8, 2021, Air Evac informed counsel for OIC that it planned to file this action against

Defendant Dodrill seeking to enjoin him from enforcing the Licensing Laws against it. Air Evac requested that counsel for OIC agree to stay the state administrative proceedings, or at least postpone the March 2 hearing, so that Air Evac could seek relief from this Court on a non-emergency basis.

98.    On February 10, counsel for OIC notified Air Evac that they would oppose a stay of the March 2 hearing.

99.    Absent intervention from this Court, Air Evac must submit to this enforcement action and participate in an administrative hearing on March 2, 2021. Unless this Court grants emergency relief before that hearing, Air Evac will be irreparably harmed.

100.   As explained more fully in Air Evac's accompanying Application, all of the elements for emergency relief are met.

101.    Air Evac is likely to succeed on the merits on its claim that the ADA preempts the Licensing Laws as applied to the Membership Program. Indeed, both this Court and the Fourth Circuit have already ruled that the ADA forbids States from regulating Air Evac's relationship with its members under this exact same program.

102.   Air Evac will be irreparably harmed absent a TRO and a preliminary injunction. *First*, as a federally-regulated air carrier, Air Evac is entitled to have its prices, services, and economic relationship with its members regulated solely under federal law—not at an administrative hearing by a state regulator applying state law. Being forced to defend itself in a state proceeding that is preempted by the ADA—thus diverting resources from its mission to provide critical emergency medical care— is itself an irreparable harm.

103.   *Second*, in the absence of emergency and injunctive relief, Air Evac will incur significant and irreparable monetary losses and irreversible disruption of its relationships with members. As soon as March 2, 2021, Air Evac could be subject to a cease-and-desist order from Defendant forbidding it from operating the Membership Program in West Virginia without a license. If that occurs, Air Evac

will be forced to stop offering the Program in order to comply with the law. That will result in the loss of revenue that Air Evac cannot recover, even if it ultimately prevails on its ADA preemption argument at some point in the future, due to the State's immunity from suit: lost revenue from unsold memberships, lost revenue from un-renewed memberships, and lost revenue due to refunds requested by existing members. Air Evac's relationship with Logan County illustrates the irreparable harm that Defendant's enforcement actions will cause if not enjoined. Logan County's Municipal Site Plan expires just weeks after the March 2 hearing; it is the largest source of Air Evac's 2020 membership revenue in the State; and at this very moment, Air Evac is engaged in active renewal discussions with Logan County. If Air Evac is forced to cease operating the Membership Program even temporarily, this will likely cost Air Evac its hard-won relationship with Logan County, as well as its relationships with the two other counties with Municipal Site Plans. If Air Evac is precluded from offering memberships for a period of months or years, it will be difficult to reestablish these relationships.

104.    *Third*, the only alternative to ceasing to offer memberships would be for Air Evac to sell memberships despite the cease-and-desist order, trusting its preemption arguments will one day be vindicated. But that, too, threatens Air Evac with irreparable harm. If Air Evac violates the Licensing Laws in defiance of Defendant's cease-and-desist order, OIC could impose civil penalties of up to $20,000 per transaction—monetary damages that, again, likely cannot be recovered due to sovereign immunity.

105.    Equity and the public interest also favor the swift resolution and vindication of Air Evac's rights under federal law. If Air Evac is forced to cease offering memberships in West Virginia on  March 2, 2021 (or at any time thereafter), West Virginia municipalities, fire departments, and citizens will be deprived of more affordable access to Air Evac's emergency air-ambulance transportation in the midst of a surging global pandemic. West Virginia residents will lose the opportunity as members to have the out-of-pocket balance of their bill cancelled if they are

transported by Air Evac or one of the other Providers. In 2020 alone, Air Evac and the other Providers cancelled over $600,000 in transport debt for their West Virginia members. Moreover, if Air Evac ceases selling memberships in Wet Virginia, its Membership Sales Managers' positions will likely be eliminated, as will Air Evac's relationship with the 31 Independent Representatives who sell memberships in the state—potentially depriving these individuals of a source of income during a serious public health crisis and economic downturn.

106.    By contrast, Defendant Dodrill will not be harmed if he is temporarily barred from enforcing the Licensing Laws, and can resume enforcement if Air Evac's federal claim fails.

## CLAIM FOR RELIEF

### Declaratory and Injunctive Relief Based on ADA Preemption

107.    Paragraphs 1 through 106 are re-alleged and incorporated here by reference.

108.    At issue is Air Evac's ability to maintain a membership plan in West Virginia allowing members to prepay for air ambulance services at a discounted price unless Air Evac obtains regulatory approval from the Department to operate as a licensed insurer, and submits to the attendant regulatory requirements imposed by West Virginia.

109.    Defendant Dodrill, as Insurance Commissioner, has the duty and authority to enforce the Licensing Laws through the pursuit of cease-and-desist orders, civil penalties, injunctive relief, and criminal penalties in both administrative and judicial actions. Defendant Dodrill has already initiated such a state administrative enforcement proceeding against Air Evac.

110.    Under the Licensing Laws, Air Evac is restricted from offering or selling memberships for prepaid, discounted air ambulance services to West Virginia residents unless Air Evac obtains and maintains regulatory approval from the Commissioner. As applied, these provisions directly relate to the price Air Evac can charge for its air transportation services as well as the manner and terms under which it can collect payment for those services. Under 49 U.S.C. § 41713(b)(1), West Virginia is

prohibited from enacting and enforcing state laws or regulations that relate to Air Evac's prices and services.

111.    Aside from a declaration that the Licensing Laws are preempted and an injunction forbidding their enforcement, Air Evac has no adequate remedy at law. The balance of harms weighs in favor of such relief, and this relief serves the public interest.

112.    Air Evac accordingly requests that this Court declare the Licensing Laws (W. Va. Code §§ 33-1-1; 33-3-1; and 33-44-1 *et seq.*) to be preempted by 49 U.S.C. § 41713(b)(1), and unenforceable as they relate to Air Evac, and to permanently enjoin Defendant Dodrill from enforcing these provisions against Air Evac. *See* U.S. Const. art. VI; 28 U.S.C. § 2201.

**PRAYER FOR RELIEF**

WHEREFORE, Air Evac respectfully asks that the Court:

1.  Issue a temporary restraining order and—after a hearing—a preliminary injunction barring Defendant Dodrill from enforcing W. Va. Code §§ 33-1-1; 33-3-1; and 33-44-1 *et seq.*, against Air Evac;

2.  Issue a judgment declaring that the ADA preempts W. Va. Code §§ 33-1-1; 33-3-1; and 33-44-1 *et seq.*, as applied to air ambulance providers;

3.  Permanently enjoin Defendant Dodrill from enforcing W. Va. Code §§ 33-1-1; 33-3-1; and 33-44-1 *et seq.*, against air ambulance providers because they are preempted by the ADA;

4.  Grant such other and further relief as this Court may deem just and proper.

Respectfully submitted,

/s/Carte P. Goodwin
Carte P. Goodwin (WV Bar No. 8039)
Alex J. Zurbuch (WV Bar No. 12838)
FROST BROWN TODD, LLC
500 Virginia Street, East, Suite 1101
Charleston, West Virginia 25301-3207
Tel.: (304) 348-2422
cgoodwin@fbtlaw.com
azurbuch@ftblaw.com

Joshua L. Fuchs (TX Bar No. #24029559)
*pro hac vice motion forthcoming*
Nicole M. Perry (TX Bar No. 24056367)
*pro hac vice motion forthcoming*
JONES DAY
717 Texas, Suite 3300
Houston, TX  77002-2712
Tel.:  (832) 239-3939
Fax:  (832) 239-3600
jlfuchs@jonesday.com

Charlotte H. Taylor (DC Bar No. 1024658)
*pro hac vice motion forthcoming*
JONES DAY
51 Louisiana Avenue N.W.
Washington, D.C. 20001-2113
Tel.:  (202) 879-3939
Fax:  (202) 626-1700
ctaylor@jonesday.com

*Attorneys for Plaintiff*