**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA**

**CHARLESTON DIVISION**

AIR EVAC EMS, INC.,

                        Plaintiff,

v.                                      CIVIL ACTION NO.   2:21-cv-00105

ALLAN L. MCVEY,                 Consolidated With:
                                          CIVIL ACTION NO.   2:21-cv-00310

                        Defendant.

**MEMORANDUM OPINION AND ORDER**

The Court awakens in Punxsutawney, Pennsylvania, circa 1993.   Much like Phil Connors, who repeats the same day over and over, the Court must consider the same issue it has considered multiple times already: whether the State of West Virginia can regulate Plaintiff Air Evac EMS Inc. as "insurance" under state law.   Unlike "Groundhog Day," though, Bill Murray is nowhere to be found, and the Court is not entertained.   For the reasons discussed below, Defendant's Motion for Summary Judgment, (ECF No. 62), is **DENIED**, and Plaintiff's Motion for Summary Judgment, (ECF No. 64), is **GRANTED**.

## I.     *BACKGROUND*

Plaintiff Air Evac EMS, Inc. ("Plaintiff" or "Air Evac") and the State of West Virginia have a turbulent history, which has been documented in various cases before this Court.   Prior to this current action, Air Evac has filed multiple lawsuits in this district against the acting West Virginia Insurance Commissioner seeking to either limit or enjoin the enforcement of certain

1

legislation or regulations.   Each time, Plaintiff has prevailed, at least in part.   *See Air Evac EMS, Inc. v. Cheatham*, 2017 WL 4765966 (S.D. W. Va. Oct. 20, 2017) ("*Cheatham*"), *aff'd*, 910 F.3d 751 (4th Cir. 2018) ("*Cheatham Appeal*"); *Air Evac EMS, Inc. v. Dodrill*, 523 F. Supp. 3d 859 (S.D. W. Va. 2021), *aff'd sub nom. Air Evac EMS, Inc. v. McVey*, 37 F.4th 89 (4th Cir. 2022) ("*Dodrill I*"); *Air Evac EMS, Inc. v. Dodrill*, 548 F. Supp. 3d 580 (S.D. W. Va. 2021) ("*Dodrill II*").   A detailed recitation of the extensive facts of these actions can be found in the Court's previous Memorandum Opinion and Order, and, therefore, need not be repeated here. *See Dodrill II*, 548 F. Supp. 3d 580.   The Court will provide a discussion of any relevant facts as necessary throughout this opinion.

On August 2, 2022, *Dodrill I* and *Dodrill II* were consolidated based on a finding that the actions involve common questions of law and fact.   (ECF No. 39.)   On December 15, 2022, the parties filed cross motions for summary judgment.   (ECF Nos. 48, 49.)   After initial briefing on both motions, the Court held a telephonic status conference to address a critical issue in the case: reverse preemption through the McCarren-Ferguson Act ("MFA").   (*See* ECF Nos. 59, 60.) Thereafter, the Court denied both motions for summary judgment as moot and ordered the parties to refile any motions for summary judgment.   (ECF No. 61.)

On July 31, 2023, Defendant filed a Motion for Summary Judgment, (ECF No. 62), and Plaintiff filed an Amended Motion for Summary Judgment, (ECF No. 64).   The parties filed respective responses, (ECF Nos. 67, 68), and replies, (ECF Nos. 70, 71).   As such, these motions are fully briefed and ripe for adjudication.

## II.    LEGAL STANDARD

Rule 56 of the Federal Rules of Civil Procedure governs summary judgment. It states, in pertinent part, that a court should grant summary judgment if "there is no genuine issue as to any material fact and the movant is entitled to judgment as a matter of law."    Fed. R. Civ. P. 56(a). "Facts are 'material' when they might affect the outcome of the case, and a 'genuine issue' exists when the evidence would allow a reasonable jury to return a verdict for the nonmoving party." *News & Observer Publ. Co. v. Raleigh–Durham Airport Auth.*, 597 F.3d 570, 576 (4th Cir. 2010). Summary judgment should not be granted if there are factual issues that reasonably may be resolved in favor of either party.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986). "Thus, at the summary judgment phase, the pertinent inquiry is whether there are any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party."  *Variety Stores, Inc. v. Wal-Mart Stores, Inc.*, 888 F.3d 651, 659 (4th Cir. 2018) (alteration and internal quotation marks omitted).

Typically, the burden is on the nonmoving party to show that there is a genuine issue of material fact for trial.  *Anderson*, 477 U.S. at 248.   "The nonmoving party must do so by offering 'sufficient proof in the form of admissible evidence' rather than relying solely on the allegations of her pleadings."  *Guessous v. Fairview Prop. Invs., LLC*, 828 F.3d 208, 216 (4th Cir. 2016) (quoting *Mitchell v. Data Gen. Corp.*, 12 F.3d 1310, 1316 (4th Cir. 1993)).

When faced with cross-motions for summary judgment, the Court must consider "each motion separately on its own merits to determine whether either of the parties deserves judgment as a matter of law."  *Rossignol v. Voorhaar*, 316 F.3d 516, 523 (4th Cir. 2003) (internal quotation marks omitted).   "Applying that standard, the facts and all reasonable inferences drawn therefrom

must be viewed in the light most favorable to the nonmoving party." *Aleman v. City of Charlotte*, 80 F.4th 264, 283–84 (4th Cir. 2023). "The court . . . cannot weigh the evidence or make credibility determinations." *Jacobs v. N.C. Admin. Office of the Courts*, 780 F.3d 562, 569 (4th Cir. 2015); *see also Lee v. Town of Seaboard*, 863 F.3d 323, 327 (4th Cir. 2017). Consequently, a court "may not credit [the movant's contrary] evidence, weigh the evidence, or resolve factual disputes in the [movant's] favor," even if "a jury could well believe the evidence forecast by the [movant]." *Aleman*, 80 F.4th at 284 (4th Cir. 2023) (alterations in original) (quoting *Hensley ex rel. North Carolina v. Price*, 876 F.3d 573, 579 (4th Cir. 2017)).

## III.    DISCUSSION

The West Virginia Legislature recently passed the Air Ambulance Protection Act ("AAPPA"), *codified at* West Virginia Code §§ 33-11B-1, 33-3-1, and 33-44-1 *et seq.* The AAPPA designates air ambulance service providers and certain affiliated entities as being "in the business of insurance" to the extent that those providers or affiliates "contract[], promise[], guarantee[], or in any way portend[] to pay, reimburse, or indemnify the copayments, deductibles, or other cost-sharing amounts of a patient['s]" "air ambulance transport." W. Va. Code § 33-11B-1(a); (ECF No. 1-1 at Ex. B.) In application, this designation would give the West Virginia Offices of the Insurance Commissioner ("OIC") the power to regulate Air Evac's Membership Program[1] under the State's insurance Licensing Laws, West Virginia Code §§ 33-1-1, 33-44-3(f), 33-3-1, and 33-4-1 *et seq.* The AAPPA appears to apply to no other entity than Air Evac. *See*

---

[1] Air Evac offers prepaid, discount memberships to individuals, business, and municipalities in West Virginia. *Dodrill II*, 548 F. Supp. 3d at 583. After enrolling in the Membership Program, which costs less than $100 for individuals and their household, any member transported by Air Evac is not responsible for any portion of their bill not paid by insurance. *Id.* In other words, the "Membership Program ensures that a member does not face any out-of-pocket costs if transported by Air Evac or one of its affiliated providers." *Id.*

*Air Evac EMS, Inc. v. McVey*, No. 2:21-cv-00310, (ECF No. 4–5 at 29).   Notably, the parties do not dispute the material facts of this case.   Instead, they disagree on the legal significance of those facts.

In this action, Air Evac seeks a declaration that the Airline Deregulation Act ("ADA") preempts the AAPPA and the Licensing Laws[2] accompanied by a permanent injunction barring the OIC from enforcing the same.   (ECF No. 1 at 29–30.)   The parties' cross-motions for summary judgment present mirror arguments.   The parties dispute (1) whether the ADA shields the Membership Program from state regulation; (2) whether the MFA protects Defendant's efforts to regulate the Membership Program; (3) whether Air Evac is entitled to preliminary or declaratory relief; and (4) whether the Court's prior preliminary injunctions should be vacated.   Each issue is addressed in turn below.

### A.   Airline Deregulation Act of 1978

The ADA expressly preempts state efforts to regulate the prices, routes, and services of certain air carriers.   *See* 49 U.S.C. § 41713(b)(1).   Prior to the ADA, two layers of regulation and oversight controlled the airline industry. "The law at [that] time contemplated dual regulatory regimes and collaboration between federal and state governments."   *Cheatham Appeal*, 910 F.3d at 755 (citing Federal Aviation Act of 1958, Pub. L. No. 85-726, § 302(k); H.R. Rep. No. 85-2360, at 14 (1958)).   Then, in 1978, Congress enacted the ADA as an effort to encourage a reliance on free market forces, remove entry barriers, and allow prices to respond to consumer demand.   *See Cheatham Appeal*, 910 F.3d at 755.   A cornerstone of this deregulatory backdrop of the ADA is

---

[2] Both parties agree that the AAPPA expressly triggers the State's Licensing Laws, the latter of which only apply to insurers.   Therefore, the Court will confine the majority of its analysis to the AAPPA, because resolving whether Air Evac can be regulated as insurance under the AAPPA will likewise determine whether it can be regulated through the State's Licensing Laws.

that, after its enactment, air travel was no longer subject to two layers of regulation.  *Id.*   Rather, the ADA makes clear that any efforts by a state to regulate the prices, routes, or services of air travel are preempted by federal regulation and oversight: "[A] State . . . may not enact or enforce a law, regulation, or other provision having the force and effect of law related to a price, route, or service of an air carrier that may provide air transportation under this subpart."  49 U.S.C. § 41713(b)(1); *see Cheatham Appeal*, 910 F.3d at 755 (citing 49 U.S.C. §§ 40101(a), 40109(a)–(b), 41102, 44103 (2012)).

Courts construe the "relating to" language in the ADA preemption clause broadly.  *See Morales v. Trans World Airlines, Inc.*, 504 U.S. 374, 384 (1992).   More specifically, the Supreme Court defines "relating to" as "having a connection with, or reference to, airline 'rates, routes, or services.'"  *See, e.g.*, *American Airlines, Inc. v. Wolens*, 513 U.S. 219, 223 (1995) (quoting *Morales*, 504 U.S. at 384).   A regulation relates to an airline's prices if it "has a 'forbidden significant effect' on prices, even without referencing them directly."  *Cheatham Appeal*, 910 F.3d at 767 (quoting *Northwest, Inc. v. Ginsberg*, 572 U.S. 273, 284 (2014)).   In fact, a law can "relate" to an air carrier's rates or services within the meaning of the ADA "even if the law is not specifically designed to affect [them], or the effect is only indirect."  *Morales*, 504 U.S. at 388. Still, some state laws may affect an air carrier "in too tenuous, remote, or peripheral a manner to have pre-emptive effect."  *Id.* at 390 (internal quotations omitted).

Here, this Court has already determined that Air Evac is an air ambulance carrier under the ADA.  *Cheatham*, 2017 WL 4765966 at *5–6.   And the AAPPA undoubtedly has the "force and effect of law."  *Ginsberg*, 572 U.S. at 282 (noting that common-law rules, statutes, and regulations all have the force and effect of law under this ADA preemption provision).   Consequently, the

parties only dispute whether the AAPPA relates to the rates, services, or routes of Air Evac. Specifically, Defendant argues that "the AAPPA affects Air Evac's prices and services in 'too tenuous, remote or peripheral a manner' to suffer preemption." (ECF No. 63 at 23 (citing *Morales*, 504 U.S. at 390).  Both Air Evac's prices and services are addressed in turn.

### 1. Prices

First, Defendant asserts that the AAPPA does not affect Air Evac's prices because it "does not establish the maximum amount the state and its insured will pay to providers," "cap the amount Air Evac can charge for flights or its memberships," "prohibit the sale of these memberships," "limit Air Evac from collecting this source of revenue," or require Air Evac "to change the price of its flights or its memberships." (*Id*. at 23 (internal quotation marks and citations omitted).) Defendant concedes that "any additional layer of regulation could increase Air Evac's overall costs" but urges the Court to reject "[s]uch an unlimited and 'indeterminate' reading of ADA preemption." (*Id*. at 24 (citing *Maracich v. Spears*, 570 U.S. 48, 59 (2013) (analyzing the Driver's Privacy Protection Act).)  Conversely, Air Evac contends that the Membership Program is a way of paying for air ambulance services and, thus, the regulation thereof relates to its pricing and services. (ECF No. 68 at 24.)

Ultimately, the Court agrees with Air Evac.  The fees for the Membership Program help fund operating costs for Air Evac.  *Dodrill I*, 523 F. Supp. 3d at 871.  Additionally, the Membership Program's fee eliminates or reduces the cost of a flight because it cancels the portion of the bill not covered by the patient's insurance that would otherwise be the patient's out-of-pocket responsibility.  *Cf. Ginsberg*, 572 U.S. at 284 (finding that an airline program that awarded mileage credits that "either eliminated or reduced" the cost of a ticket necessarily related to the

airline's rates); *Wolens*, 513 U.S. at 226 (same).   Thus, as this Court previously recognized, "[l]imiting the program would both limit a source of revenue that contributes to the cost of providing flights and would impact the charges levied on consumers."   *Dodrill I*, 523 F. Supp. 3d at 871.

Likewise, the AAPPA limits the Membership Program by prohibiting Air Evac from seeking payment from a member's commercial insurer unless Air Evac obtains an insurance license from Defendant and complies with the dictates of the West Virginia Insurance Code.   *See* W. Va. Code § 33-11B-1(c).   Put another way, the AAPPA would regulate the billing relationship between Air Evac and its potential passengers.

Further, by treating Air Evac as an insurer, the AAPPA would require Air Evac to maintain unencumbered capital and surplus of at least $2,000,000 at all times, W. Va. Code § 33-3-5b(a)-(b), and pay mandatory licensing and filing fees, W. Va. Code § 33-3-13(a), or otherwise face penalties, W. Va. Code § 33-3-11(b).   As such, the AAPPA would require Air Evac to either: (1) comply with costly regulatory requirements to obtain and maintain an insurance license in order to seek payment from a member's insurer, or (2) face exposure to civil and criminal penalties and other enforcement action for operating as an unauthorized insurer.   Based on this Hobson's choice, Defendant's argument that the AAPPA's effect on Air Evac's rates would be too tenuous, remote, or peripheral to have pre-emptive effect simply does not fly.

Therefore, Defendant's "effort to regulate Air Evac's Membership Program clearly relates to a price of an air carrier providing air transportation."   *See Dodrill I*, 523 F. Supp. 3d at 871.

2.  <u>Services</u>

Even though Defendant recognizes that the ADA does not define what constitutes a "service" of an air carrier, he next claims that the term "service" is limited to "access to flights and class-of-service upgrades," "boarding procedures," and "other contractual features appurtenant and necessarily included with the contract of carriage between the passenger and the airline such as the ticketing, boarding procedures, provision of food and drink, and baggage handling."   (ECF No. 63 at 24 (internal quotation marks and citations omitted).)   Thus, because the Membership Program does not offer these types of services, Defendant argues that the AAPPA does not relate to services at all.   (*Id.*)   On the other hand, Air Evac contends that ADA preemption is not limited to state laws affecting aspects of commercial air travel such as "boarding procedures," "ticketing," or "provision of food and drink."   (ECF No. 68 at 25.)

Again, the Court agrees with Plaintiff.   To start, the Supreme Court has found state laws that limit programs which eliminate or reduce the cost of a flight or class-of-service upgrade relate to rates and "services."   *See Ginsberg*, 572 U.S. at 284; *Wolens*, 513 U.S. at 226; (*but see* ECF No. 63 at 24 (arguing that *Wolens* suggests that "service" is categorically limited to "*access* to flights and class-of-service upgrades").)   Further, Defendant relies, in part, upon *Hodges v. Delta Airlines, Inc.*, 44 F.3d 334 (5th Cir. 1995) (en banc), to elucidate what it believes are the types of activities that should define the scope of "services."   In *Hodges*, however, the Fifth Circuit held that the ADA did not preempt a "state law tort claim for physical injury based on alleged negligent *operation* of [an] aircraft."   44 F.3d at 335 (emphasis added).   In reaching this conclusion, the Fifth Circuit distinguished between claims premised on "the operation and maintenance of aircraft," which fall outside the definition of "services," and "contractual features of air

9

transportation," which do not.   *Id.* at 336.   Notably, the Fifth Circuit did not limit the definition of "services" to "ticketing, boarding procedures, provision of food and drink, and baggage handling," and, instead, only listed those types of services as examples relevant in that case.   As such, Defendant's attempt to limit the scope of "services" to these activities is unconvincing.

Here, Air Evac's Membership Program allows members to pay a fee, and, in exchange, Air Evac cancels all costs not covered by their insurance, which would otherwise be the member's out-of-pocket responsibility.   As clear as the sky is blue, this is a contractual feature of its air transportation service because it is "a bargained-for or anticipated provision of labor from" Air Evac to its members and has nothing to do with "the operation and maintenance of aircraft."   *Id.* at 336–37.   Thus, the AAPPA relates to a service of an air carrier providing air transportation.

Accordingly, there is no genuine dispute of material fact, and because the AAPPA relates to the services and rates of an air carrier providing air transportation, it is preempted by the ADA.

   *B. The McCarran-Ferguson Act*

Nevertheless, as in prior stages of this litigation, Defendant argues that the ADA must yield to the AAPPA under the reverse preemption provision of the MFA, which provides that "[t]he business of insurance, and every person engaged therein, shall be subject to the laws of the several States . . . ."   15 U.S.C. § 1012(a).   In countering that the MFA does not save the AAPPA, Air Evac asserts that the Court does not need to conduct an MFA analysis at all because (1) the ADA expressly repeals the MFA, (ECF Nos. 65 at 20–21, 68 at 22–23), and (2) the MFA is inapplicable where the practice regulated is not the business of insurance, (ECF Nos. 65 at 23, 68 at 13–18). Alternatively, Air Evac contends that the Membership Program is not the "business of insurance"

under the MFA.  (ECF Nos. 65 at 24–28, 68 at 18–22).  Each of these arguments is addressed below.

### 1.  Has the MFA been "displaced" by the ADA?

There is "no doubt" that Congress can suspend or repeal a federal statute.  *United States v. Dickerson*, 310 U.S. 554, 555 (1940).  Congress has the power to amend, suspend or repeal a statute by an appropriations bill, as long as it does so *clearly*.  *Robertson v. Seattle Audubon Soc.*, 503 U.S. 429, 440 (1992).  "The whole question depends on the intention of Congress as expressed in the statutes."  *United States v. Mitchell*, 109 U.S. 146, 150 (1883).

"An express repeal requires that Congress overtly state with specificity that the subsequent statute repeals a portion of the earlier statute."  *Patten v. United States*, 116 F.3d 1029, 1033 (4th Cir. 1997) (quoting *Gallenstein v. United States*, 975 F.2d 286, 288–89 (6th Cir.1992)).  This occurs when the subsequent statute specifically refers to an earlier statute.  *See id.* ("Because the text of the 1981 Amendment does not mention the effective date of the 1976 Amendment, there has been no express repeal."); *see also Moyle v. Dir., Off. of Workers' Comp. Programs*, 147 F.3d 1116, 1119 n.4 (9th Cir. 1998) ("This case does not concern an express repeal because neither statute specifically refers to the other.") (citation omitted)).

The repeal by implication doctrine, by contrast, "applies when two laws are in direct conflict and Congress has not 'overtly state[d]' which should prevail."  *United States v. Frank*, 8 F.4th 320, 330 (4th Cir. 2021) (quoting *Patten*, 116 F.3d at 1033–34).  To that end, the Fourth Circuit has instructed that the circumstances in which an implied repeal or amendment will be found are limited to "where there is [1] an 'irreconcilable conflict' between statutes and [2] also a 'clear and manifest' congressional intent to repeal."  *Id.* (citing *Patten*, 116 F.3d at 1034).  The

Supreme Court has made clear that implied repeals and amendments to statutes are disfavored. *Nat'l Ass'n of Home Builders v. Defs. of Wildlife*, 551 U.S. 644, 664 & n.8 (2007).   In fact, "because an implied repeal is disfavored, there is a 'strong presumption' against finding such a repeal." *Patten*, 116 F.3d at 1034 (citing *Blevins v. United States*, 769 F.2d 175, 181 (4th Cir. 1985)).

Air Evac claims the ADA expressly repeals the MFA.   (*See* ECF Nos. 65 at 20–21, 68 at 22–23.)   For support, Air Evac points to the plain language of the ADA, which states that "[e]xcept as provided in this subsection, a State . . . may not enact or enforce a law . . . related to a price, route, or service of an air carrier," 49 U.S.C. § 41713(b)(1), and notes that the ADA contains no exceptions for insurance-related state laws, (ECF No. 65 at 21).   Consequently, Air Evac argues that "[t]he MFA does not apply . . . because it has been displaced by the later-enacted ADA."   (ECF No. 65 at 21.)   Although creative, this argument fails to land.

To start, this argument conflates express and implied repeal.   The plain text of the ADA— which Air Evac cites—never mentions the MFA.[3]   *See Patten*, 116 F.3d at 1033.   In fact, while the ADA limits *states'* ability to enact laws that relate to air carrier's prices, routes, and services,

_____

[3] Air Evac argues that "Congress is not required to use an 'express reference or other magical password'" to abrogate its prior enactments.   (ECF No. 68 at 22 (quoting *Dorsey v. United States*, 567 U.S. 260, 274 (2012).)   Specifically, Air Evac claims that an express repeal can exist when a later statute declares itself the "sole and exclusive" authority on an area of law or other broad claims of authority.   (*Id.* at 22–23 (citing *Marcello v. Bonds*, 349 U.S. 302, 310 (1955); *Lockhart v. United States*, 546 U.S. 142 (2005).)   However, the cases Air Evac cites discussed whether a later statute could amend a previously enacted statute that requires any later statute to "expressly provide" that it was repealing or amending it.   *See Dorsey*, 567 U.S. at 272 (discussing the general federal saving statute, which provides that a new criminal statute that "repeal[s]" an older criminal statute shall not change the penalties "incurred" under the older statute "unless the repealing Act shall so expressly provide"); *Marcello*, 349 U.S. at 310 (discussing the Administrative Procedure Act, which provides that "[n]o subsequent legislation shall be held to supersede or modify the provisions of this Act except to the extent that such legislation shall do so expressly"); *Lockhart*, 546 U.S. 142 (discussing the Social Security Act, which provides that "[n]o other provision of law . . . may be construed to . . . modify . . . this section except to the extent that it does so by express reference").   This is diametrically different than what constitutes an express repeal and does not affect the Court's analysis.   Instead, as the Fourth Circuit has clearly stated, "[a] repeal that must be inferred is, by definition, an implied repeal."   *Patten*, 116 F.3d at 1033.

it does not limit any other *federal* laws. 49 U.S.C. § 41713(b)(1). Thus, the ADA did not expressly repeal the MFA.

Further, Air Evac's argument fails even under an implied repeal analysis because, as Defendant notes, (*see* ECF No. 70 at 20), it fails to show an "irreconcilable conflict." To that point, the circumstance in which both the ADA and MFA would be applicable are remote. Admittedly, air ambulance services approach the boundary of ADA and MFA intersection, but even so most courts have found that the MFA does not apply in a manner that conflicts with the ADA. *See, e.g.*, *Bailey v. Rocky Mountain Holdings, LLC*, 889 F.3d 1259 (11th Cir. 2018) (holding that the MFA did not reverse ADA's preemptive effect on an insured's claim); *Guardian Flight LLC v. Godfread*, 991 F.3d 916 (8th Cir. 2021) (holding that the MFA did not supersede preemptive effect of multiple ADA provisions). As such, any potential conflict between the MFA and ADA remains purely theoretical, and theoretical conflicts are not enough to overcome the strong presumption against implied preemption.

Therefore, the ADA does not "displace" the MFA.

2. Are prepaid medical services plans and debt-cancellation agreements the "business of insurance" under the MFA?

Air Evac notes that the Supreme Court, multiple federal courts of appeal, and this Court, have held that prepaid medical services plans and debt-cancellation agreements are not the "business of insurance" under the MFA because they involve no promise to indemnify subscribers and therefore implicate none of the insurance-related concerns that motivated Congress to enact the MFA. (ECF No. 65 at 25 (collecting cases).) Thus, Air Evac argues that, because the Membership Program is a prepayment arrangement involving no indemnity, the MFA does not apply as a matter of law. (*Id.*) Defendant counters that (1) the Membership Program is not a

prepaid medical services or debt-cancellation plan under West Virginia law, (ECF Nos. 67 at 20–21, 70 at 18), and (2) Air Evac's argument relies on distinguishable federal authority, (ECF No. 70 at 18.)

Ultimately, the Court need not decide whether Air Evac's Membership Program is a prepaid medical services or debt-cancellation plan to resolve this issue because none of the cases Air Evac cites held that, *as a matter of law*, prepaid medical services plans and debt-cancellation agreements are categorically not the "business of insurance" under the MFA.   *See generally Grp. Life & Health Ins. Co. v. Royal Drug Co*., 440 U.S. 205 (1979); *Guardian Flight*, 991 F.3d at 923; *Anglin v. Blue Shield of Virginia*, 693 F.2d 315, 320 (4th Cir. 1982).   Instead, the Supreme Court has made clear that "the particular relationship being questioned [must] be examined in each case." *Anglin*, 693 F.2d at 317 (discussing *Royal Drug*, 440 U.S. 205).

Therefore, the Court must now analyze the particular facts at issue in this case to determine whether MFA reverse preemption is applicable.

### 3.   Does the MFA save the AAPPA?

Defendant argues that the AAPPA satisfies an MFA analysis, while Air Evac claims that the AAPPA cannot be saved by the MFA.   (ECF Nos. 63 at 12–13, 65 at 20.)   These arguments echo those already made and addressed in *Dodrill II*, where this Court found that the AAPPA was likely preempted by the ADA and could not be saved through MFA reverse-preemption.   *See* 548 F. Supp. 3d 580.   The undisputed facts in the record at this juncture do not lead to a different conclusion.

In this case, the operative provision of the MFA can be found in the first clause of 15 U.S.C. § 1012(b),[4] and states, in relevant part, that:

> No Act of Congress shall be construed to invalidate, impair, or supersede any law *enacted* by any State *for the purpose of regulating the business of insurance*, or which imposes a fee or tax upon such business, unless such Act specifically relates to the business of insurance . . . .

15 U.S.C. § 1012(b) (emphasis added).   This clause allows certain state laws to supersede conflicting federal laws through reverse preemption.

In *United States Department of Treasury v. Fabe*, the Supreme Court articulated a three-part test to determine whether a federal statute must yield to a state statute pursuant to the MFA. 508 U.S. 491 (1993).   First, the state statute must have been "enacted . . . for the purpose of regulating the business of insurance.   *See Fabe*, 508 U.S. at 501; *Humana Inc. v. Forsyth*, 525 U.S. 299, 307 (1999); *Gross v. Weingarten*, 217 F.3d 208, 222 (4th Cir. 2000) (quoting *Humana*). That is, the law must have the "end, intention, or aim of adjusting, managing or controlling the business of insurance."   *Fabe*, 508 U.S. at 505.   Second, the federal statute must not "specifically relate[] to the business of insurance."   *Id.*   Third, the application of the federal statute must "invalidate, impair, or supersede" the state statute.   *Id.*

Here, both parties agree that the ADA does not specifically relate to the business of insurance and, if applicable, ADA preemption would invalidate the AAPPA.   So, the only issue

---

[4] The second clause of § 1012(b) states:

> [A]fter June 30, 1948, . . . the Sherman Act, . . . the Clayton Act, and . . . the Federal Trade Commission Act, as amended, shall be applicable to *the business of insurance* to the extent that such business is not regulated by State law.

15 U.S.C. § 1012(b).   This clause exempts the insurers from the federal antitrust laws for activities regulated by state law which qualify as the business of insurance.

before the Court is whether the state law in question—the AAPPA—has "end, intention, or aim of adjusting, managing or controlling the business of insurance" pursuant to *Fabe*.

As the parties note, inconsistency has arisen regarding how courts apply this prong of the *Fabe* test.   (ECF Nos. 63 at 15, 71 at 10–11.)   Some circuits have found the test set forth in *Union Labor Life Ins. Co. v. Pireno*, 458 U.S. 119 (1982),[5] to be inapplicable beyond the antitrust context.   *See Autry v. N.W. Premium Servs., Inc.*, 144 F.3d 1037 (7th Cir. 1998) (*Pireno* test limited to antitrust cases under the second clause of § 1012(b)); *Doe v. Norwest Bank Minn.*, 107 F.3d 1297 (8th Cir. 1997) (same); *Colonial Life & Accident Ins. Co. v. Am. Family Life Assurance Co. of Columbus*, 846 F. Supp. 454 (D.S.C. 1994) (same).   Other courts have employed the *Pireno* test to varying degrees when determining what is the "business of insurance" in the first clause. *See e.g.*, *United States v. Dep't of Ins.*, 66 F.4th 114, 124 (3rd Cir. 2023); *Guardian Flight*, 991 F.3d at 922; *Sabo v. Metro. Life Ins. Co.*, 137 F.3d 185 (3rd Cir. 1998); *Merch. Home Delivery Serv. Inc. v. Frank B. Hall & Co., Inc.*, 50 F.3d 1486, 1490 (9th Cir. 1995); *Blackfeet Nat'l Bank v. Nelson*, 171 F.3d 1237, 1246-48 (11th Cir. 1994).

The Fourth Circuit has never expressly addressed this issue, leaving it unclear to what extent it is appropriate to use the *Pireno* test under the first clause of § 1012(b).   While at least one district court in this circuit has indicated in dicta that the *Pireno* test may be "relevant . . . for the limited purpose of defining the business of insurance," it did not actually conduct a *Pireno* analysis.   *See Ambrose v. Blue Cross & Blue Shield of Virginia, Inc.*, 891 F. Supp. 1153, 1160

---

[5] In *Pireno*, the Supreme Court outlined three factors to determine if a practice falls within the "business of insurance" under the second clause of § 1012(b): "*first*, whether the practice has the effect of transferring or spreading a policyholder's risk; *second*, whether the practice is an integral part of the policy relationship between the insurer and the insured; and *third*, whether the practice is limited to entities within the insurance industry." 458 U.S. at 129 (emphasis in original).

(E.D. Va. 1995), *aff'd,* 95 F.3d 41 (4th Cir. 1996) (per curiam); *accord. Ambrose v. Blue Cross & Blue Shield of Virginia, Inc.*, 95 F.3d 41 (4th Cir. 1996) (agreeing "with the district court's reasoning and conclusion" without addressing the district court's discussion of the *Pireno* test).

In the Court's view, *Pireno*'s applicability depends on the factual circumstances of the statute and the practice it regulates. As *Fabe* established, laws "enacted . . . for the purpose of regulating the business of insurance" is a more expansive category than practices constituting "the business of insurance." 508 U.S. at 505. At the focal point of this broad category are "'[s]tatutes aimed at protecting or regulating th[e] relationship [between insurer and insured], directly or indirectly.'" *See id.* at 501 (third alteration in original) (quoting *SEC v. National Securities, Inc.,* 393 U.S. 453, 460). Logically, a state law exclusively regulating a practice that is unquestionably the "business of insurance" is a direct regulation of this relationship, thereby satisfying *Fabe*. Where, as here, a state law narrowly aims to regulate a single practice that may or may not be insurance, the *Pireno* test helps inform a court's determination of whether the aim of the statute is the regulation of "business of insurance". *Cf. Ambrose,* 891 F. Supp. At 1160 (finding the *Pireno* test relevant to define the "business of insurance" under the first clause of § 1012(b)). In other words, if a practice that is the sole target of a state law falls within *Pireno*'s definition of "the business of insurance," then, axiomatically, the state law directly regulates both an insurer and an insured, as well as the relationship between the two. Consequently, the MFA would save such a state law from federal preemption. On the other hand, if the state law does not directly regulate the "business of insurance," the MFA only saves it if the law otherwise affects the relationship between the policyholder and the insured, i.e. *indirectly* regulates the business of insurance. *See Fabe*, 508 U.S. at 501.

Here, the AAPPA effectively regulates only one practice: Air Evac's Membership Program. At previous stages of this litigation, the Court has already found that the Membership Program likely does not constitute the business of insurance under the *Pireno* test. *See Dodrill I*, 523 F. Supp. 3d at 872–73 (Berger, J.) (finding, after reviewing all evidence in the record, that "Air Evac is likely to prevail in demonstrating that its Membership Program is not insurance . . . ."); *Dodrill II*, 548 F. Supp. 3d at 592 (Johnston, C.J.) (finding that, under *Pireno* "Air Evac is likely to prevail in demonstrating that neither it nor its Membership Program is insurance."). Since those determinations, Defendant has offered no evidence that would lead to a different conclusion. Thus, the Court need not put the same facts through the machinery of *Pireno* only to repeat the analyses from its previous decisions. Simply put, if the *Pireno* test is applicable here, the Membership Program is not the business of insurance. In turn, Air Evac is not an insurer and members of its Membership Program are not policyholders or insureds. And because the AAPPA is narrowly tailored to only regulate the Membership Program, it does not have a *direct* effect on an insurance company and its policyholders.

All that remains is an examination whether the AAPPA was enacted to *indirectly* regulate the relationship between insurances companies and policyholders. However, beyond Defendant labeling the Membership Program as "insurance," nothing in the record shows that the AAPPA "possesses the end, intention, or aim of adjusting, managing, or controlling the business of insurance." *Fabe*, 508 U.S. 491 (internal quotations omitted). Likewise, the record contains no evidence of any effect on the relationship between insurers, insureds, or any other entity tangentially related to the business of insurance. Indeed, because the Membership Program applies only to members' costs that are not covered by insurance, its benefit is only realized *after*

the insurance claim process has been completed.   Therefore, the relationship between a member's insurance company and the member is unaffected in any way, either directly or indirectly.

Nevertheless, Defendant claims that the AAPPA was enacted for the purposes of regulating insurance because it would apply to any air ambulance prepaid memberships that stray into the field of insurance.—i.e., where the OIC determines that the provider "contracts, promises, guarantees, or in any way portends to pay, reimburse, or indemnify the copayments, deductibles, or other cost-sharing amounts of a patient['s]" "air ambulance transport."   (ECF No. 63 at 8 (quoting W. Va. Code § 33-11B-1(a)).)   This linguistic gamesmanship is nothing more than a transparent attempt to circumvent this Court's finding that Air Evac and the Membership program are not insurance.   After Defendant's previous attempt to regulate Air Evac as insurance was not cleared to land in *Cheatham*, the State drafted the AAPPA to categorically define Air Evac's Membership Program as insurance.   Then, after the Court enjoined the OIC from enforcing the Licensing Laws against Air Evac in *Dodrill I*, the legislature attempted one final go-around to regulate Air Evac as insurance.   Using a perceived "roadmap" to "avoid preemption" laid out by the Eight Circuit in *Guardian Flight*, (*see* ECF Nos. 63 at 9, 62-2 at 17), the State amended the AAPPA to include the limiting language referenced above.   In the Defendant's view, the AAPPA would therefore leave Air Evac's business unregulated in only those instances where "it did [not] seek reimbursement for [it's] costs from the insurer or Medicare," thereby regulating only the Membership Program itself as insurance.   (ECF No. 62-2 at 19.)   Unfortunately for the State, the addition of buzz words drawn from the language of insurance does not change the "end, intention, or aim" of the AAPPA, which is to legislatively define Air Evac's Membership Program as the "business of insurance" and regulate it as such.

At bottom, the State's insertion of insurance terminology into the AAPPA does not transmute it into a statute that was enacted for the purpose of regulating the business of insurance. Accordingly, the MFA does not save the AAPPA through reverse preemption.

*C. Standing*

Defendant next argues that if it is true that the Membership Program does not promise "to indemnify or pay specific amounts to their members" or pay "third party providers under any circumstances," then Air Evac lacks standing to challenge the AAPPA. Essentially, Defendant asks this court to find that if Air Evac prevails on its arguments above, this pyrrhic victory necessarily means that it never had standing to challenge the AAPPA in the first place. The Court does not agree.

Article III standing has three elements. The plaintiff must have "suffered an injury in fact that is concrete, particularized, and actual or imminent." *Thole v. U.S. Bank N.A.*, 140 S. Ct. 1615, 1618, (2020). The plaintiff's injury must have been "caused by the defendant," and it must be "likely" the plaintiff's injury will "be redressed by the requested judicial relief." *Id.*

However, for Article III purposes, "[a]n allegation of future injury may suffice if the threatened injury is 'certainly impending,' or there is a 'substantial risk that the harm will occur.'" *Bryant v. Woodall*, 1 F.4th 280, 285 (4th Cir. 2021) (quoting *Babbitt v. United Farm Workers Nat'l Union*, 442 U.S. 289, 298 (1979) and *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 158 (2014)). Critically, an unlawful attempt at regulation is itself a cognizable injury when plaintiff avers facts establishing that "plaintiff is [itself] an object of the action . . . at issue." *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 562 (1992). In such cases, "there is ordinarily little question" that plaintiff has standing to challenge the proposed regulatory action. *See* id. at 561–62.

The long and troubled history of this case leaves little doubt that Air Evac is itself the object of the State's attempted regulatory schemes.   *See Cheatham*, *Cheatham Appeal*, *Dodrill I, Dodrill II*.   This is especially true considering that Air Evac is the only air-ambulance provider in the state selling memberships.   Defendant's own statements promising to "shut down" the Membership Program and his "troubling" cooperation with Air Evac's in-state competitor, are more than sufficient to show that Air Evac is the object of the AAPPA.   *See Dodrill I*, 523 F. Supp. 3d at 869.   Also noteworthy is the fact that the Legislature reworded HB 2776 in an attempt to "moot" *Dodrill I* and *Guardian Flight* and avoid ADA preemption, (*see Air Evac EMS, Inc. v. McVey*, 2:21-cv-00310, ECF No. 4-5 at 27–28), as the Fourth Circuit has made clear that the legislature's "recent revisions to its statutory scheme" "suggest . . . a renewed interest in regulating" the Membership Program.   *See Bryant*, 1 F.4th at 287.   Further, the now operative AAPPA, with its attempts to vector the Membership Program into the realm of "insurance," buttresses the conclusion that if no permanent injunction is granted, there is a substantial risk that Air Evac will be "shut down" by the Defendant.   Even if a shut down or interruption in its business is temporary, Air Evac will likely suffer a "loss of revenue and damage its relationship with customers, lay off employees, and the added difficulty of regaining customers lost as a result of the shut down."   *See Dodrill I*, 523 F. Supp. 3d at 873–74.   As such, there is no doubt that Air Evac has suffered an injury in the form of an imminent attempt to shutter its business pursuant to authority granted in the AAPPA.

The second and third standing requirements—i.e., causation and redressability—are also clearly satisfied.   The OIC is responsible for enforcing insurance laws in West Virginia.   Its own statements and actions demonstrate an ongoing campaign to enforce insurance regulations against

Air Evac.   Similarly, this Court may redress the injury in the form of a declaratory judgment that the Membership Program is not insurance and a permanent injunction prohibiting the State from enforcing insurance regulations against Air Evac.

At bottom, all of the facts show that the legislature and commissioner have been attempting to regulate the Membership Program as insurance for nearly a decade.   To suggest that Air Evac lacks standing in the face of such attempts would defy reason.

Accordingly, Air Evac clearly has standing to challenge the AAPPA.

*D.  Injunctive Relief*

Air Evac also seeks a permanent injunction barring enforcement of the AAPPA and the Licensing Laws against it.   Plaintiffs seeking a permanent injunction must first demonstrate "actual success" on the merits.   Once shown, plaintiffs must next demonstrate that (1) it has suffered "an irreparable injury"; (2) "remedies available at law, such as monetary damages, are inadequate to compensate for that injury"; (3) "considering the balance of hardships between the plaintiff and defendant, a remedy in equity is warranted"; and (4) "the public interest would not be disserved by a permanent injunction."  *eBay Inc. v. MercExchange, L.L.C.,* 547 U.S. 388, 391 (2006).   In effect, this standard is "the same as for a preliminary injunction with the exception that the plaintiff must establish success on the merits and that the focus on irreparable harm includes the question whether the plaintiff has an adequate remedy at law."  *Nat'l City Bank of Indiana v. Turnbaugh*, 367 F. Supp. 2d 805, 821 (D. Md. 2005), *aff'd sub nom. Nat'l City Bank of IN v. Turnbaugh*, 463 F.3d 325 (4th Cir. 2006) (collecting cases).

Here, all elements of a permanent injunction are satisfied as to the AAPPA and Licensing Laws.   To start, because the Court determined that the ADA preempts the AAPPA and that Air

Evac and its Membership Program are not insurance, Air Evac has prevailed on the merits.   Air Evac has also satisfied the four remaining elements.

First, the impending unconstitutional enforcement of the AAPPA and Licensing Laws "supplies the necessary irreparable injury." *Air Evac EMS, Inc. v. McVey*, 37 F.4th 89, 103 (4th Cir. 2022) (quoting *Morales* 504 U.S. at 381–82).   Second, without the injunction Air Evac will have no adequate remedy at law because it will continue to face the Commissioner's ongoing attempts "to shut down the Membership Program which would result in the loss of customers and employees, damages that could not be remedied by money."   *Id.*   Third, the balance of hardships weighs in favor of an injunction because the state cannot point to *any* hardship it would suffer as a result, much less a hardship that would outweigh Air Evac's loss of customers, employees, and other damages or the injustice of being subjected to an invalid law.   Fourth, a permanent injunction here serves the public interest by preserving a federal statute and preventing enforcement of invalid state law.   *Legend Night Club v. Miller*, 637 F.3d 291, 302–03 (4th Cir. 2011); *United States v. Alabama*, 691 F.3d 1269, 1301 (11th Cir. 2012) (finding that "[f]rustration of federal statutes [such as the ADA]" is decidedly "not in the public interest").

Accordingly, Air Evac has satisfied all the elements necessary for permanently enjoining the State from enforcing the AAPPA and Licensing Laws against it.

## IV.   CONCLUSION

In "Groundhog Day," Phil Connors was forced to relive the same day over and over until he finally chose to change his ways.   Let this comedy convey an important message to Defendant: continuously trying to declare Air Evac's Membership Program as insurance will result in the same outcome because "simply calling something insurance does not make it [so]," *Dodrill II*, 548 F.

23

Supp. 3d at 592, any more than calling a spatula a Stradivarius enables the spatula to produce the exquisite notes of Vivaldi's "Spring" from *The Four Seasons*.

Reliving the same day over may not be a sanction within the grasp of this Court, but others are available.  At this point, further litigation of these matters may cross the frontier between peculiarly persistent and frankly frivolous.   That frontier is on the horizon at twelve o'clock.

For the reasons discussed above, Defendant's Motion for Summary Judgment, (ECF No. 62), is **DENIED**, and Plaintiff's Motion for Summary Judgment, (ECF No. 64), is **GRANTED**. Accordingly, the Court **ORDERS** that Defendant be **ENJOINED** from enforcing the AAPPA, *codified* at West Virginia Code §§ 33-11B-1, 33-3-1, and 33-44-1 *et seq.*, and the Licensing Laws, West Virginia Code §§ 33-1-1, 33-44-3(f), 33-3-1, and 33-4-1 *et seq.*, against Plaintiff Air Evac EMS, Inc.

**IT IS SO ORDERED**.

The Court **DIRECTS** the Clerk to send a copy of this Order to counsel of record and any unrepresented party.

ENTER:        March 26, 2024

THOMAS E. JOHNSTON, CHIEF JUDGE